# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT and KAREN BRUNNER, ) | |
| ) | |
| Plaintiffs, ) | Case No. 1:19-cv-03396 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| BELTMANN GROUP ) | |
| INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This case is about an interstate move gone wrong, and the question is whether it belongs in federal court. The dispute starts where the story ends: many of Plaintiffs' household goods were lost or destroyed during their move from the Midwest to New England.

In 2012, Robert and Karen Brunner (the two Plaintiffs) moved out of Illinois. Defendant Beltmann Group packed their household items, shipped them to its storage facility in Illinois, and stored them for six years. In the meantime, the Brunners lived in New York City, and eventually moved to Vermont in 2018. North American Van Lines, a non-party, then shipped their possessions from Beltmann's storage facility in Illinois to the Brunners' new home in Vermont. Unfortunately, some of their belongings arrived damaged, and some did not arrive at all.

The Brunners filed a common law breach of contract claim against Beltmann in Illinois state court for the loss of their household goods. *See* Complaint ("Cplt.") at 22–23 (Dckt. No. 1-1). Beltmann removed the case to federal court on the grounds that the claim was preempted by the Carmack Amendment, a federal statute that provides an exclusive federal remedy for damage to goods in interstate shipments.

Plaintiffs now move to remand. For the following reasons, Plaintiffs' motion to remand is denied.

**Background**

Robert and Karen Brunner left Illinois and moved to the East Coast in 2012. Before leaving the state, the Brunners arranged for North American Van Lines and its servicing agent, Beltmann Group, to move their belongings across the country. In 2012, Beltmann gave the Brunners an estimate for the packing, storage, and delivery of their goods. *See* Def.'s Resp. to Pls.' Mot. to Remand ("Def.'s Response") at 3 (Dckt. No. 15). The estimate recognized that the Brunners were moving from Illinois to "Bethlehem, PA." *See* Exhibits to Def.'s Response, Ex. A at 2 (Dckt. No. 15-2). So, from the very first interaction, Beltmann contemplated an interstate move.

The parties ultimately entered into a contract, known as the bill of lading. *See id.*, Ex. B at 5. The contract contemplated that Beltmann would handle the first part of the cross-country journey. The bill of lading required Beltmann to pack the Brunners' household goods at their Illinois home, ship them to its facility in a nearby Chicagoland suburb, and store them pending further instructions. *Id.* Like the estimate, the bill of lading contemplated an eventual shipment from the Illinois storage facility to a to-be-determined address in "Bethlehem, PA." *Id.*

Once the Brunners finalized their new address, North American Van Lines would ship the goods from Beltmann's Illinois storage facility to the Brunners' Pennsylvania home. *See id.*, Ex. A at 2 (Dckt. No. 15-2); Def.'s Aff. of Michael Harvey ("Harvey Aff.") at 3–4 (Dckt. No. 15-1). The specific address was up in the air, but the interstate character of the shipment was not. Everyone understood that the goods – like the Brunners – were leaving Illinois.

As planned, Beltmann packed the goods at the Brunners' house in Illinois, transported them to its storage facility in Illinois, and provided "storage-in-transit," awaiting the specific Pennsylvania address from the Brunners. *See* Harvey Aff. at ¶¶ 15–16 (Dckt. No. 15-1). Storage "in transit" means that "the shipper and Beltmann intend for the storage to be temporary before delivery to a final destination." *Id*. at ¶ 14. "In transit" took longer than one might expect: the Brunners' possessions sat in storage until 2018, six long years. *See* Def.'s Response at ¶¶ 18–20 (Dckt. No. 15). But the household belongings remained in transit nonetheless – no one viewed the storage facility as the final destination.

The Brunners apparently had a change of heart about moving to Pennsylvania. Instead, the Brunners moved to New York City, and they did not seek delivery of their items during their time in New York. *See* Pls.' Mot. to Remand at ¶ 2 (Dckt. No. 12). The Brunners do not say why. Maybe there wasn't enough space in New York.

In 2018, the Brunners moved to Vermont and asked Beltmann for an estimate to ship their possessions to their new home in the Green Mountain State. *See* Harvey Aff. at ¶ 17 (Dckt. No. 15-1). That 2018 estimate – which bears both Beltmann and North American Moving Company logos in the letterhead – contemplates the Vermont destination. *See* Exhibits to Def.'s Response, Ex. C at 8 (Dckt. No. 15-2). The estimate states that Beltmann would be the originating agent for the Vermont move, and that Hanover Transfer & Storage would be the Destination Agent. *Id.*

The 2018 estimate is the last piece of paper in the record about the final leg of the journey (before the move took place, that is). There was no new bill of lading. Instead, the original bill of lading from 2012 apparently governed the move in 2018, even though the move took place years later.

In March 2018, North American Van Lines picked up the items and shipped them to the Brunners' new home in Vermont. *See* Pls.' Mot. to Remand at ¶¶ 12–13 (Dckt No. 12). Their belongings did not arrive all in one piece. Some of their possessions suffered "damage[]" along the way. *See* Cplt. at ¶ 6 (Dckt. No. 1-1). Some of their belongings never made it at all. *Id.*

The carrier, North American Van Lines, "took responsibility for the damage to the Brunners' personal property in transit from Western Springs, Illinois to West Dover, Vermont," and paid the Brunners for the damage to those goods. Pls. Mot. to Remand at ¶¶ 6–7 (Dckt. No. 12). North American Van Lines reviewed its shipping records, including a detailed listing of the items it picked up from the Beltmann storage site, and agreed to pay for the damage to items that it received from Beltmann in good condition. *See* Pls.' Mot. to Remand, Ex. A at 45 (Dckt. No. 12). Ultimately, North American Van Lines paid the Brunners $4,225 for damage that occurred on its watch. *Id.* North American Van Lines recommended that the Brunners reach out to Beltmann for the rest of the loss. *Id.*

The Brunners later sued Beltmann for $34,700, the alleged balance of the damages, plus fees and costs. *See* Cplt. at 1–2 (Dckt. No. 1-1). They filed a complaint against Beltmann in the Circuit Court of Cook County, alleging breach of contract for lost and damaged household goods. On May 20, 2019, Defendant removed the case to federal court on the grounds that the Carmack Amendment preempts Plaintiffs' common law breach of contract claim. *See* Notice of Removal at 2 (Dckt. No. 1). Plaintiffs filed a petition for remand, arguing that the Carmack Amendment does not apply. *See generally* Pls.' Mot. for Remand (Dckt. No. 12).

**Analysis**

**I.    The Carmack Amendment Preempts State Law Claims.**

At first glance, the complaint may not seem to belong in federal court. Diversity jurisdiction does not apply. The parties are diverse, but the amount in controversy (less than $35,000) is far below the statutory minimum of $75,000+. *See* 28 U.S.C. § 1332(a).

Federal question jurisdiction does not leap from the pages of the complaint, either. *See* 28 U.S.C. § 1331. "Under the longstanding well-pleaded complaint rule . . . a suit 'arises under' federal law 'only when the plaintiff's statement of his own cause of action shows that it is based upon [federal law].'" *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)). Federal defenses and federal counterclaims don't count. *See Vaden*, 556 U.S. at 60; *Holmes Grp., Inc. v. Vornado Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002). Here, the Brunners did not purport to bring a federal cause of action. Instead, they filed a breach of contract claim against Beltmann under state law. *See generally* Cplt. at 1–2 (Dckt. No. 1-1).

If the analysis ended there, so would this case (in federal court, anyway). But federal question jurisdiction can arise from complete preemption. A complaint "purporting to rest on state law, we have recognized, can be recharacterized as one 'arising under' federal law if the law governing the complaint is exclusively federal." *Vaden*, 556 U.S. at 61. That is, a complaint that advances only a state law claim may belong in federal court if federal law completely occupies the field. *Id.*; *see also City of Chicago v. Comcast Cable Holdings, LLC*, 384 F.3d 901, 905 (7th Cir. 2004) ("The name is misleading because the doctrine is unrelated to preemption but deals with occupation of the field . . . ."); *Lehmann v. Brown*, 230 F.3d 916, 919–20 (7th Cir. 2000) ("State law is 'completely preempted' in the sense that it has been replaced by federal law

5

– but this happens because federal law takes over all similar claims, not because there is a preemption defense.").

Under the complete preemption doctrine, "[w]hen a plaintiff has asserted a cause of action under state law that has been judicially declared to be completely preempted by federal law, that claim – no matter how it may have been set out in the complaint or characterized by the plaintiff – is necessarily federal, and will be recharacterized as federal, thereby permitting removal." 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3722.1 (4th ed. 2019). In those cases, "federal law does not merely preempt a state law to some degree; rather, it substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal." *Id.* at § 3722.2.

If there is complete preemption of a state law claim, the Court will "recharacterize the plaintiff's cause of action as a federal claim for relief, making removal proper on the basis of federal-question jurisdiction." *Id.* So, even when a complaint alleges only state law claims, if Congress has occupied that field "so comprehensively that it has left no room for supplementary state legislation," the claims may be removed to federal court because the federal law "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Di Joseph v. Standard Ins. Co.*, 776 Fed. Appx. 343, 347 (7th Cir. 2019) (finding ERISA completely preempted state law claims); *see also Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 67 (1987) (citing 28 U.S.C. § 1331) (holding that a lawsuit that raised only preempted state law claims was necessarily federal in character by virtue of the "clearly manifested intent of Congress," and thus arose under the laws of the United States).

Courts apply the complete preemption doctrine narrowly. *See In re Repository Techs., Inc.*, 601 F.3d 710, 723 (7th Cir. 2010) (citing *Adkins v. Illinois Cent. R.R. Co.*, 326 F.3d 828,

835 (7th Cir. 2003)); *see also* 16 James Wm. Moore *et al.*, *Moore's Federal Practice* § 107.75 (3d ed. 2019) ("Application of the complete preemption doctrine is the rare exception rather than the rule."). The Supreme Court has recognized complete preemption in a handful of areas, including sections of the Employee Retirement Income Security Act, the Labor Management Relations Act, possession of tribal lands, and the National Bank Act. *See* 16 James Wm. Moore *et al.*, *Moore's Federal Practice* § 107.75 (3d ed. 2019) (citing cases).

One of the statutes that completely preempts state law claims is the Carmack Amendment. "[F]ederal courts have held particular claims to be completely preempted by statutes including . . . the Carmack Amendment to the Interstate Commerce Act." *See* 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3722.2 (4th ed. 2019) (citing cases); *see also Korer v. Danita Corp.*, 584 F. Supp. 2d 1103, 1105 (N.D. Ill. 2008) (holding that removal was proper because the Carmack Amendment preempted the shipper's state law claim for an item lost in an interstate shipment); *Pierre v. United Parcel Serv., Inc.*, 774 F. Supp. 1149, 1150–51 (N.D. Ill. 1991) (holding that removal was proper because the Carmack Amendment preempted the state law claim).

"The Carmack Amendment governs liability of a common carrier to a shipper for loss of, or damage to, an interstate shipment." *North American Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 455 (7th Cir. 1996). The provisions create a uniform rule of carrier liability for interstate shipments by imposing strict liability on carriers. A carrier that provides transportation or service is liable for loss or injury to property:

> A carrier providing transportation or service subject to jurisdiction under [the jurisdictional statutes] shall issue a receipt or bill of lading for property it receives for transportation under this part. *That carrier and any other carrier that delivers the property and is providing transportation or service* subject to jurisdiction under [the jurisdictional statutes] *are liable* to the person entitled to

7

> recover under the receipt or bill of lading. The liability imposed under this paragraph is *for the actual loss or injury* to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . . . Failure to issue a receipt or bill of lading does not affect the liability of a carrier.

49 U.S.C. § 14706(a)(1) (emphasis added).

The Carmack Amendment creates a federal cause of action for loss or injury to property. A plaintiff must show three simple points: "(1) delivery in good condition; (2) arrival in damaged condition; and (3) the amount of damages." *REI Transport, Inc. v. C.H. Robinson Worldwide, Inc.,* 519 F.3d 693, 699 (7th Cir. 2008) (quoting *American Nat'l Fire Ins. Co. v. Yellow Freight Sys.*, 325 F.3d 924, 929 (7th Cir. 2003)). Once a plaintiff makes this prima facie showing, the burden shifts to the defendant to show "that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Id.*

Before Congress enacted the Carmack Amendment, the market for interstate shipment of goods was plagued by disparate state schemes that led to unpredictable liability for carriers. *See REI Transport*, 519 F.3d at 697. Carrier liability "was a matter either of common law, whether state or federal (at least until *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938)), or of state positive law." *North American Van Lines*, 89 F.3d at 456 (citing *Adams Express Co. v. Cronginger*, 226 U.S. 491, 504 (1913)).

To provide uniformity, the statute limits the carrier's liability to the "actual loss or injury to the property damaged en route." 49 U.S.C. § 14706(a)(1). And "a shipper" – meaning a person whose goods are transported by a carrier – "cannot bypass these limits by filing a state suit for the damaged goods unless the claim seeks to remedy a 'separate and independently actionable harm.'" *REI Transport*, 519 F.3d at 698 (quoting *North American Van Lines*, 89 F.3d at 458) (citation omitted). But the statute does not apply to intrastate transportation: it applies to

8

transportation "between a place in . . . a State and a place in another State." 49 U.S.C. § 13501(1)(A).

The Carmack Amendment preempts state law claims that a shipper might advance against a carrier for lost or damaged goods shipped across state lines. *See REI Transport*, 519 F.3d at 697 (citing *Adams Express Co. v. Croninger,* 226 U.S. 491, 505–06 (1913)). In *Adams Express*, the Supreme Court recognized that Congress intended "to take possession of the subject" and prescribe uniform rules governing uniform liability of carriers to shippers regarding interstate shipments. *Adams Express*, 226 U.S. at 505–06; *see also North American Van Lines*, 89 F.3d at 456. Congress also sought to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.*, 695 F.2d 253, 257 (7th Cir. 1982) (quoting *Reider v. Thompson*, 339 U.S. 113, 119 (1950)).

As the Seventh Circuit has recognized, the Carmack Amendment "preempts all state or common law remedies available to a shipper against a carrier for loss or damage to interstate shipments." *See North American Van Lines*, 89 F.3d at 456; *see also REI Transport*, 519 F.3d at 697–98 (7th Cir. 2008) ("The preemptive sweep of the Carmack Amendment extends to state causes of action against carriers 'where goods are damaged or lost in interstate commerce.'") (citation omitted).

In fact, the Courts of Appeals on this question are "unanimous[]." *See Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of America, Inc.*, 762 F.3d 332, 336 (3d Cir. 2014). "Courts of Appeals from the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have consistently held that the Carmack Amendment is the 'exclusive cause of action for interstate-shipping contract [and tort] claims

9

alleging loss or damage to property.'" *Id.* (citation omitted). All of those Circuits have "dismissed state and common law claims for breach of contract, negligence, conversion and every other action for loss of or injury to a shipment of goods." *Id.*

Even so, Congress did impose a roadblock to removal. A claim under the Carmack Amendment "may not be removed to any district court of the United States unless the matter in controversy exceeds $10,000, exclusive of interest and costs." 28 U.S.C. § 1445(b). This case easily clears that jurisdictional hurdle, with over $34,000 in alleged losses.

## II.     The Carmack Amendment Applies to this Case.

The Carmack Amendment preempts state law claims, so the question becomes whether the federal statute applies to the Brunners' claims. Plaintiffs make two arguments against applying the Carmack Amendment here. First, they argue that Beltmann was not a "carrier" within the meaning of the Act, and thus the Act does not govern its conduct. Second, they argue that all of Beltmann's conduct took place exclusively in Illinois, and the statute does not reach *intra*state conduct.

### A.     Beltmann's Status as a "Carrier."

The Carmack Amendment imposes liability on a "carrier" for the loss or injury to goods. *See* 49 U.S.C. § 14706(a)(1). The Brunners argue that Beltmann was not a "carrier" at all. In their view, Beltmann acted as a broker, not a carrier, and thus the Act does not apply.

Deciding whether Beltmann was a "carrier" requires the Court to peel three layers of statutory definitions. The Carmack Amendment defines "carrier" to mean "water carrier, a motor carrier, and a freight forwarder." 49 U.S.C. § 13102(3). A "motor carrier," in turn, is defined as a "person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). And "transportation" includes both "a motor vehicle . . . related to the movement

of passengers or property" and "services related to that movement, including *arranging for, receipt*, delivery, . . . *storage, handling,* [and] *packing*" of passengers and property. 49 U.S.C. § 13102(23) (emphasis added); *see also Mitsui Sumitomo Ins. Grp. v. Navistar Inc. et al.*, 2014 WL 1245290, at *2 (N.D. Ill. 2014) (citing 49 U.S.C. § 13102 to conclude that defendant Navistar, which provided packaging for the purposes of shipping, was a carrier).

The parties agree that Beltmann stored, shipped, handled, and packed Plaintiffs' goods. *See* Pls.' Mot. to Remand at ¶ 1 (Dckt. No. 12) (stating that personal property was "packed and stored" by Beltmann); Cplt. at ¶ 1 (Dckt. No. 1-1) (Beltmann agreed to "provide packing services, storage service, and then to deliver plaintiffs' household goods to plaintiffs at an out of state location"); Cplt. at ¶ 3 ("defendant packed up plaintiffs' household goods and provided a descriptive inventory list to plaintiffs"); Cplt. at ¶ 4 ("Defendant stored plaintiffs' household goods in Roselle, Illinois up until March 2018"); Def.'s Response at ¶ 5 ("As part of the interstate transaction, Beltmann provided packing, transportation, and temporary storage services under North American Van Lines ('NAVL') interstate motor carrier authority"). Beltmann thus qualifies as a "carrier" as defined by the plain language of the statute. The Act expressly applies to the "storage, handling, [and] packing" of property. 49 U.S.C. § 13102(23). That's what Beltmann did.

Plaintiffs incorrectly suggest that *intra*state haulers cannot qualify as a "carrier." Under the Carmack Amendment, a person can qualify as a "carrier" even if it is responsible for only a short, intrastate portion of a longer interstate shipment. *See Codan Forsikring A/S v. ConGlobal Indus., Inc.*, 315 F. Supp. 3d 1085, 1091 (N.D. Ill. 2018) (finding defendant was a "carrier" where it transported the cargo for "only . . . a limited distance, and only intrastate"); *Fireman's Fund Ins. Co. v. Reckart Logistics, Inc.*, 2011 WL 4062508, at *3 n.1 (N.D. Ill. 2011); *Project*

11

*Hope v. M/V IBN SINA,* 250 F.3d 67, 75 (2d Cir. 2001) ("if the final intended destination at the time the shipment begins is another state, the Carmack Amendment applies throughout the shipment, even as to a carrier that is only responsible for an intrastate leg of the shipment."). It is enough if Beltmann handled a leg – even an *intra*state leg – on an interstate journey.

The Brunners also argue that Beltmann should be considered a broker, instead of a carrier. Pls.' Reply at 1–2 (Dckt. No. 16). Liability under the Carmack Amendment does not extend to brokers. *See Sompo Japan Ins. Co. of America v. B&H Freight, Inc.*, 177 F. Supp. 3d 1084, 1087 (N.D. Ill. 2016) (the Carmack Amendment does not preempt a claim against brokers); *Traffic Tech, Inc. v. Arts Transp., Inc.*, 2016 WL 1270496, at *3 (N.D. Ill. 2016) ("Other courts have recognized such claims [seeking indemnity as a broker] are separate and distinct claims outside the scope of the Carmack Amendment."). So, if Beltmann acted as a broker, and only as a broker, the Carmack Amendment would not apply.

A broker "sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). When distinguishing between a broker and a carrier, the Court must determine "if a defendant's actions were limited to arranging transport or if the defendant indicated that it would exert 'some measure of control' over the shipment." *Dabecca Natural Foods, Inc. v. RD Trucking, LLC, et al.*, 2015 WL 2444505, at *4 (N.D. Ill. 2015) (citation omitted). The Court must also determine whether the defendant "took legal responsibility for transporting the goods, regardless of who actually delivered them." *Id.* (quoting *The Mason and Dixon Lines, Inc. v. Walters Metal Fabrication, Inc.*, 2014 WL 4627715, at *3 (S.D. Ill. 2014)).

Beltmann did more than merely arrange for transportation of these goods. Indeed, Beltmann took physical custody of the belongings and thus exerted control over the shipment. *See* Cplt. at ¶¶ 3–4 (Dckt. No. 1-1) (Defendant "packed up plaintiffs' household goods," and "stored plaintiffs' household goods," and Plaintiffs allege that Beltmann's handling of the goods caused harm); Pls.' Mot. to Remand at ¶ 1 (Dckt. No. 12) (Plaintiffs seek damages from Beltmann for loss of property "that had been packed and stored by Beltmann"). After all, that's the whole point of this lawsuit. The Brunners claim that Beltmann took possession of their belongings, but the belongings did not cross the country safe and sound.

### B. The Number of Shipments

Second, the Brunners recycle their interstate argument and argue that there were two shipments, not just one. The first leg (in 2012) took place between two suburbs in Illinois. The second leg (in 2018) took place between Illinois and Vermont. Plaintiffs argue that Beltmann only played a role in the 2012 leg, and all of it was *intra*state. As the Brunners see it, the goods merely moved between Chicagoland suburbs, so Beltmann did not participate in an interstate shipment.

The question is whether the journey that started in 2012 involved one or two shipments. If the Illinois leg of the journey was its own shipment, then the Carmack Amendment would not apply because it was purely intrastate. *See* 49 U.S.C. § 13501(1)(A) (providing that the Carmack Amendment applies to transportation between "a place in . . . a State and a place in another State").

But the Brunners' belongings embarked on an interstate voyage from day one. In fact, Plaintiffs' own complaint admits that Beltmann agreed in 2012 to play a role in a cross-country shipment. "Defendant agreed to provide packing services, storage service, and then to deliver

plaintiffs' household goods to plaintiffs at an *out of state* location." See Cplt. at ¶ 1 (Dckt. No. 1-1) (emphasis added).

The 2012 bill of lading contemplated that Beltmann would play an important part in an interstate shipment.[1] Under the bill of lading, Beltmann provided the packing services, moved the goods to its storage facility, and stored the goods. See Harvey Aff. at ¶¶ 11–15 (Dckt. No. 15-1). Then, North American Van Lines eventually delivered the goods to the Brunners' new home in another state. While the ultimate destination changed from Pennsylvania to Vermont, the interstate character of the shipment did not.

When multiple carriers are responsible for different legs of a generally continuous shipment, courts look to the "intended final destination of the shipment as that intent existed when the shipment commenced." *See Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74 (2d Cir. 2001). "The nature of a shipment is not determined by a mechanical inspection of the bill of lading nor by when and to whom title passes but rather by the essential character of the commerce, reflected by the intention formed prior to shipment, pursuant to which property is carried to a selected destination by a continuous or unified movement." *Id.* (quoting *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 699 (11th Cir. 1986)).

---

[1] The original 2012 bill of lading appears to be the operative – and only – bill of lading. There is no other bill of lading before the Court. See Pls.' Mot. to Remand at 120 (Dckt. No. 12); Harvey Aff. at 5–6 (Dckt. No. 15-1). The Brunners suggest it is the operative bill of lading in their motion to remand. *See* Pls.' Mot. to Remand at 3 (Dckt. No. 12) (citing to the 2012 bill of lading to argue that Beltmann is not a carrier here). North American Van Lines and Beltmann both appear on that bill of lading: North American Van Lines issued it, but it refers to Beltmann's services throughout. It lists Beltmann as a North American Servicing Agent, as "1 Hauler," and Beltmann's agent code – "19840" and "1984" – appears multiple times on the bill of lading. *See* Pls.' Mot. to Remand at 120–21 (Dckt. No. 1); Def.'s Response at ¶ 13 (Dckt. No. 15). A Beltmann employee signed the addendum to the bill of lading, "North American Van Lines Statement of Additional Services." Exhibits to Def.'s Response at 6 (Dckt. No. 15-2) (signature of agent includes "1984"). And the bill of lading indicates "in transit" storage by "19840," again, the code for Beltmann. *Id.* at 5.

From the very beginning, everyone involved in the move knew the end-game: the Brunners were leaving the state, and so were their household goods. Everyone knew that the goods wouldn't stay in the Beltmann's storage facility. And they wouldn't stay in Illinois, either. Once the Brunners provided the out-of-state address, North American Van Lines would ship the goods from Illinois to Pennsylvania. The move was always interstate.

It might be a different story if the Brunners had gotten their hands on the goods *after* they arrived in the Chicagoland storage facility and before shipping them to Vermont. Courts have found separate shipments where the shipper received the goods and had a chance to examine them before reshipping them. *See S.C. Johnson & Son*, 695 F.2d at 257–58 (finding that a shipment from Kentucky to Wisconsin was separate from the one returning the same goods to Kentucky because the original bill of lading did not contemplate that the goods would be returned to their original destination). But the Brunners never took possession of the goods between shipments. The goods left their home in Illinois, and arrived in Vermont years later, without a reunion with their owners in the meantime.

Courts have divided a delivery into two separate shipments when the shipper signed contracts with two separate carriers, and the first carrier finished its job before the second carrier took over. *See Eddie Bauer v. Focus Transp. Servs.*, 881 F. Supp. 1174, 1179 (N.D. Ill. 1995) (finding two shipments when plaintiff had separate contracts with two carriers: the bill of lading contemplated plaintiff's Ohio facility as its "Final Stop," and a separate bill of lading governed the trip to Illinois). Here, no one considered the Beltmann storage facility to be the final stop – it was always considered a stop along the way. And there was only one bill of lading, too. So Beltmann, like the goods themselves, was along for the entire ride.

Even if one views the 2018 leg as a separate shipment, the claim against Beltmann could *still* fall under the Carmack Amendment. First, Beltmann provided both storage and handling related to the movement of the property at the outset of the 2018 move. After all, the 2018 move began by picking up the goods from Beltmann's facility. As a result, Beltmann meets the statutory definition of a carrier. *See* 49 U.S.C. § 13102(23); Cplt. ¶ 4 (Defendant stored property until March 2018); Exhibits to Def.'s Resp., Ex. C at 8 (Defendant listed as Origin Agent of 2018 move). Second, the record suggests that Beltmann may have played an even more significant role. The Brunners attached a document to their Motion to Remand that lists Beltmann as the hauler from Illinois to Vermont. *See* Pls.' Mot. to Remand, Ex. A at 49 (Dckt. No. 12). Specifically, the claim settling agent sent an email to Beltmann titled "CLAIM NOTIFICATION," which details the Brunners' claim against Beltmann. *Id.* It lists Beltmann as Hauler 1 and Hauler 2, with "Hanover Transfer & Storage" in Hanover, New Hampshire as the destination en route to Vermont.

| Service Provider Role | Service Provider/Driver Name | Number |
|---|---|---|
| Booker | BELTMANN CHICAGO | 1984-000 |
| Origin Service | BELTMANN CHICAGO | 1984-000 |
| Hauler 1 | BELTMANN GROUP, INC.-HAULING!! | 1450-000 |
| Driver 1 | HEH | 40508 |
| Destination Service | HANOVER TRANSFER & STORAGE | 1114-000 |
| Hauler 2 | BELTMANN GROUP, INC.-HAULING!! | 1450-000 |
| Driver 2 | HEH | 40508 |
| Settling Agent | SIRVA | 0000-000 |

*Id.* At the very least, the document suggests that Beltmann played a role in the interstate move in 2018.

## Conclusion

Plaintiffs' claim falls squarely within the bounds of the Carmack Amendment. The Carmack Amendment completely preempts state law claims for loss or damage to goods shipped in interstate commerce. *See North American Van Lines, Inc.*, 89 F.3d at 456 ("The Carmack Amendment thus preempts all state or common law remedies available to a shipper against a

carrier for loss or damage to interstate shipments."). That's what this case is all about. The Brunners seek damages for the loss of their belongings during a cross-country move.

The motion to remand is denied. Plaintiffs have leave to amend their complaint to expressly invoke the Carmack Amendment by February 28, 2020.

Date: February 11, 2020

Steven C. Seeger
United States District Judge